**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JUSTIN TIMOTHY STACKHOUSE, | ) | |
| | ) | Civil Action No. 16 – 329 |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| BRIAN V. COLEMAN, | ) | |
| *Superintendent*, THE ATTORNEY | ) | |
| GENERAL OF THE STATE OF | ) | |
| PENNSYLVANIA, and BUTLER | ) | |
| COUNTY DISTRICT ATTORNEY'S | ) | |
| OFFICE, | ) | |
| | ) | |
| Respondents. | ) | |

## MEMORANDUM OPINION

Before the Court is a Petition for Writ of Habeas Corpus ("Petition") filed by Petitioner

Justin Timothy Stackhouse ("Petitioner") pursuant to 28 U.S.C. § 2254, as amended by the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). (ECF Nos. 1, 2). He is

challenging his judgment of sentence entered January 26, 2012 in the Court of Common Pleas of

Butler County. <u>Com. v. Stackhouse</u>, CP-10-CR-0000959-2011 (Butler Cty. Common Pleas

Ct.).[1]

### A.    **Factual and Procedural History**

The following factual and procedural history of the Petitioner's criminal case was set

forth by the Pennsylvania Superior Court on direct appeal of Petitioner's judgment of sentence.

---

[1] The docket sheet for Petitioner's criminal case can be found online at
https://ujsportal.pacourts.us.

. . . The Pennsylvania State Police had received information that appellant and several other individuals had been purchasing large amounts of pseudoephedrine at various pharmacies. After investigating the matter, members of the Pennsylvania State Police went to appellant's residence at 132 Cherry Valley Road in Butler County to conduct what they termed a "knock and talk" on May 20, 2011. They wanted to speak with the occupants of the residence about suspected manufacturing of methamphetamine and appellant's outstanding warrants from Florida.

The officers proceeded to walk up the driveway to the house where they observed two fans located in the basement stairwell pointing outward acting as a form of an exhaust system. As the troopers continued to the backdoor, they saw a burnt "blister pack," which is packaging for pseudoephedrine, and a piece of surgical tubing near the steps leading to the back porch. The troopers believed these items were all indicia of a methamphetamine lab.

When the officers knocked on the door, appellant's girlfriend, Robyn Tuttle ("Tuttle"), answered. The troopers, who were not in uniform, identified themselves and asked her to get appellant to come outside. Appellant "[c]ame out, swore at us a little bit, ran back in, and eventually we got him out of the house to talk to him." Tuttle's father and Tuttle's five-year-old son were also in the residence at the time. Appellant was handcuffed and placed on the ground as he was acting very "unruly" and "wild." After consulting privately with appellant, Tuttle gave the officers permission to search the residence and signed the consent form. The troopers agreed that appellant was permitted to walk through the residence during the search. Appellant took the officers through the house and while in his bedroom, pointed out a black box where he kept items he used for taking drugs. Additionally, several gallon-sized freezer bags were recovered containing meth oil; essentially a combination of Coleman fuel and methamphetamine, which was one step away from being converted into usable methamphetamine. Appellant was arrested and charged with various offenses.

On July 26, 2011, appellant filed an omnibus pre-trial motion challenging the legality of the search. The motion was denied on September 2, 2011. Following a jury trial, appellant was convicted of unlawful manufacturing of methamphetamine child under 18 years of age present, possession of methamphetamine precursors with intent to manufacture methamphetamine, possession with intent to manufacture a controlled substance of 100 grams of more, possession of a controlled substance, and possession of drug paraphernalia; he was found not guilty of endangering the welfare of a child. The Commonwealth sought the application of the minimum sentencing guidelines as set forth by 18 Pa.C.S.A. § 7508(a)(4)(iii) as appellant was a subsequent offender and the weight of the mixture recovered was 800 grams. Appellant was sentenced on January 26, 2012; with regard to his conviction for unlawful manufacturing of methamphetamine appellant was sentenced to 35 to 70 months' incarceration to

be served concurrently with his sentence of 96 to 240 months for possession with intent to manufacture methamphetamine in excess of 100 grams. No further penalties were imposed on the remaining charges.

Com. v. Stackhouse, No. 338 WDA 2012, 2013 WL 11273720, at *1 (Pa. Super. Mar. 19, 2013) (internal citations and footnote omitted); (Resp't Exh. 19, ECF No. 9-6, pp.5-8).

Petitioner's judgment of sentence was affirmed on direct appeal in a Memorandum issued by the Pennsylvania Superior Court on March 19, 2013. (Resp't Exh. 19, ECF No. 9-6). He then filed a timely petition pursuant to Pennsylvania's Post-Conviction Relief Act ("PCRA") on June 10, 2013, and on August 9, 2014, he filed a counseled amended petition. (Resp't Exh. 20; ECF No. 9-7, pp.1-10); (Resp't Ex. 22; ECF No. 9-8). The PCRA court held a hearing on September 19, 2013, and subsequently denied the petition on December 20, 2013. (Resp't Ex. 23; ECF No. 9-9). The Superior Court then affirmed the PCRA court's order denying relief in a Memorandum dated November 25, 2014. (Resp't Exh. 28; ECF No. 9-11, pp.1-8). Petitioner filed a Petition for Allowance of Appeal with the Pennsylvania Supreme Court, which was denied by that court on May 28, 2015. (Resp't Exhs. 29, 30; ECF No. 9-11, pp.9-10). The instant Petition for Writ of Habeas Corpus was postmarked March 17, 2016 and docketed by the Clerk on March 21, 2016.[2] (ECF No. 1.)

---

[2] Respondents assert that the Petition was untimely filed and should be dismissed on that basis alone. (ECF No. 9, pp.3-4). However, their computation of the statute of limitations is incorrect as only 52 days elapsed between the time when Petitioner's judgment of sentence became final (April 18, 2013) to the day he filed his PCRA petition (June 10, 2013), and then another 293 days elapsed between the day his PCRA proceedings concluded (May 28, 2015) and the day he mailed his Petition for Writ of Habeas Corpus to this Court (March 17, 2016). That is a total of 345 days. In addition to other errors, it appears that Respondents calculated the statute of limitations to begin on March 19, 2013, the day the Superior Court affirmed his conviction and sentence, and not April 18, 2013, the last day Petitioner had to file a Petition for Allowance of Appeal to the Pennsylvania Supreme Court. See Swartz v. Meyers, 204 F.3d 417, 419 (3d Cir. 2000) (noting that a judgment becomes final at the conclusion of direct review or the expiration

**B.     Applicable Standards**

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a

federal habeas court may overturn a state court's resolution of the merits of a constitutional issue

only if the state court decision was "contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States."  28

U.S.C. § 2254(d)(1).  The Supreme Court of the United States, in Williams v. Taylor, 529 U.S.

362 (2000), discussed the analysis required by § 2254(d)(1):

> [Under the "contrary to" clause], a federal habeas court may grant the writ if the
> state court arrives at a conclusion opposite to that reached by this Court on a
> question of law or if the state court decides a case differently than this Court has
> on a set of materially indistinguishable facts.  Under the "unreasonable
> application" clause, a federal habeas court may grant the writ if the state court
> identifies the correct governing legal principle from this Court's decisions but
> unreasonably applies that principle to the facts of the prisoner's case.

Id. at 1498.  The Third Circuit Court of Appeals, consistent with the Williams v. Taylor

interpretation, set forth in Matteo v. Superintendent, SCI-Albion, 171 F.3d 877 (3d Cir. 1999),

cert. denied 528 U.S. 824 (1999), a two-tier approach to reviewing § 2254(d)(1) issues:

> First, the federal habeas court must determine whether the state court decision
> was "contrary to" Supreme Court precedent that governs the petitioner's claim.
> Relief is appropriate only if the petitioner shows that "Supreme Court precedent
> requires an outcome contrary to that reached by the relevant state court."  O'Brien
> [v. Dubois], 145 F.3d [16], 24-25 [1st Cir. 1998)].  In the absence of such a
> showing, the federal habeas court must ask whether the state court decision
> represents an "unreasonable application" of Supreme Court precedent; that is,
> whether the state court decision, evaluated objectively and on the merits, resulted
> in an outcome that cannot reasonably be justified.  If so, then the petition should
> be granted.

Id. at 891.  The phrase "clearly established Federal law," as the term is used in Section

2254(d)(1) is restricted "to the holdings, as opposed to the dicta of [the United States Supreme

---

of time for seeking such review, including the time limit for filing a writ of certiorari in the
Supreme Court).

Court] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 365.

Under the "unreasonable application" clause,

> a federal habeas court may not grant relief simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

Id. If a petitioner is able to satisfy the requirements of § 2254(d)(1), then the state court decision is not entitled to deference under AEDPA and the federal habeas court proceeds to a *de novo* evaluation of the constitutional claim on the merits. *See* Tucker v. Superintendent Graterford SCI, 677 F. App'x 768, 776 (3d Cir. 2017) (citing Panetti v. Quarterman, 551 U.S. 930, 953 (2007) ("When . . . the requirement set forth in § 2254(d)(1) is satisfied[,] [a] federal court must then resolve the claim without the deference AEDPA otherwise requires.")). Indeed, the Third Circuit recently explained that,

> [w]hile a determination that a state court's analysis is contrary to or an unreasonable application of clearly established federal law is necessary to grant habeas relief, it is not alone sufficient. That is because, despite applying an improper analysis, the state court still may have reached the correct result, and a federal court can only grant the Great Writ if it is "firmly convinced that a federal constitutional right has been violated," Williams, 529 U.S. at 389, 120 S.Ct. 1495. *See also* Horn v. Banks, 536 U.S. 266, 272, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002) ("[w]hile it is of course a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review . . . none of our post-AEDPA cases have suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard"). Thus, when a federal court reviewing a habeas petition concludes that the state court analyzed the petitioner's claim in a manner that contravenes clearly established federal law, it then must proceed to review the merits of the claim de novo to evaluate if a constitutional violation occurred. *See* Lafler v. Cooper, 566 U.S. 156, 174, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012).

Vickers v. Superintendent Graterford SCI, 858 F.3d 841, 848-89 (3d Cir. 2017) (internal footnote omitted).

The AEDPA further provides for relief if an adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Under § 2254(d)(2), a state court decision is based on an "unreasonable determination of the facts" if the state court's factual findings are "objectively unreasonable in light of the evidence presented in the state-court proceeding," which requires review of whether there was sufficient evidence to support the state court's factual findings. *See* <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003). Within this overarching standard, a petitioner may attack specific factual determinations that were made by the state court, and that are subsidiary to the ultimate decision. Here, § 2254(e)(1) comes into play, instructing that the state court's determination must be afforded a presumption of correctness that the petitioner can rebut only by clear and convincing evidence. <u>Lambert v. Blackwell</u>, 387 F.3d 210, 235 (3d Cir. 2004).

**C.      Discussion**

Petitioner raises the following five grounds for relief: (1) Pennsylvania's mandatory sentencing provision found at 18 Pa. C.S.A. § 7508(a)(4) violates the Equal Protection Clause of the United States Constitution; (2) ineffective assistance of counsel in failing to raise certain arguments in relation to Tuttle's consent to search the house; (3) violation of procedural due process based on the trial court's consideration of evidence not found in the record; (4) trial court error in finding no Fourth Amendment violation with regard to Tuttle's consent given to search the house; and (5) illegal sentence.

**1.      Mandatory Minimum Sentencing Provision in 18 Pa. C.S.A. § 7508(a)(4)**

Petitioner first argues that Section 7508(a)(4)(iii) violates the Equal Protection Clause of the United States Constitution. In support of this claim, he presents the following argument:

The evidence at issue was not in fact drugs, nor was the weight involved a chemical cut used to increase the mass of a drug for more profit. This is were [*sic*] the ambiguity lies, the chemical compound in question was unconsumable in its present form, and unusable as a drug, therefore it is not a drug. By definition a drug is something consumable by a person and used for mind altering purposes's [*sic*], it was fuel. If it cannot be ingested into the body, it cannot be construed as a drug. The state inflated the crime to aquire [*sic*] a mandatory minimum sentence. The chemical in question is one of many precursor chemicals used in the production of meth. The lab team testified that this colemen [*sic*] fuel was steps away from becomming [*sic*] usable methamphetmene [*sic*]. This is a matter of interpretation and application of the intended statute and it's [*sic*] miss-use [*sic*] in the case at bar, as beign [*sic*] unconstitutional and a coercive application and miss-use [*sic*] of a well intended state statute.

(ECF No. 1, p.5). Petitioner raised a version of this claim on direct appeal of his judgment of sentence arguing that the statute violated the Equal Protection Clauses of the United States and Pennsylvania Constitutions because it "is overly broad and arbitrarily asses a greater punishment for possessing increased amounts of a mixture containing methamphetamine; when that mixture is not cable of being ingested as a controlled substance; and if continued to be processed would yield far smaller quantities of an actual usable controlled substance, which is the object of the legislation." (Resp't Ex. 17; ECF No. 9-5, pp.9-10). The Pennsylvania Superior Court found the claim to be meritless and addressed it as follows:

Section 7508 applies to drug trafficking sentences and penalties. Subsection (a)(4) is applicable to persons whose convictions relate to the controlled substance methamphetamine. The various subparts of this subsection set forth penalties depending on the aggregate weight of the compound and whether the defendant at the time of sentencing has been convicted of another drug trafficking offense.

Again, appellant was a subsequent offender and was convicted of possession with intent to manufacture methamphetamine in excess of 100 grams. The methamphetamine in his possession was suspended in Coleman fuel, which is a liquid. Expert testimony was presented that this liquid compound was essentially one step away from becoming usable, sellable methamphetamine. Appellant argues that the statute is overly broad and arbitrary; he claims it assesses greater punishments for possessing increased amounts of a "mixture containing methamphetamine when the mixture is not capable of being ingested

as a controlled substance, and if continued to be processed would yield far smaller quantities of the actual usable drug." (Appellant's brief at 14, 17.) In other words, appellant contends that we should only consider the consumable finished product of the methamphetamine, not the product in process, for purposes of setting the mandatory minimum. We disagree.

The General Assembly, in enacting 18 Pa.C.S.A. § 7508, exhibited its awareness that methamphetamine is commonly possessed in a mixture as there is a continuing process to produce the drug; this awareness is plainly and unambiguously expressed in that statute.

> (4) A person who is convicted of violating section 13(a)(14), (30) or (37) of The Controlled Substance, Drug, Device and Cosmetic Act where the controlled substance is methamphetamine or phencyclidine or is a salt, isomer or salt of an isomer of methamphetamine or phencyclidine <u>or is a mixture containing methamphetamine or phencyclidine</u>, containing a salt of methamphetamine or phencyclidine, containing an isomer of methamphetamine or phencyclidine, containing a salt of an isomer of methamphetamine or phencyclidine shall, upon conviction, be sentenced to a mandatory minimum term of imprisonment and a fine as set forth in this subsection:

> * * *

> (iii) when the aggregate weight of the compound <u>or mixture containing the substance involved</u> is at least 100 grams; five years in prison and a fine of $50,000 or such larger amount as is sufficient to exhaust the assets utilized in and the proceeds from the illegal activity; however, if at the time of sentencing the defendant has been convicted of another drug trafficking offense: eight years in prison and $50,000 or such larger amount as is sufficient to exhaust the assets utilized in and the proceeds from the illegal activity.

18 Pa.C.S.A. § 7508(a)(4)(iii) (emphasis added).

Case law has long settled that the weight of the entire mixture containing the controlled substance is the proper measurement of the weight of the controlled substance, not the weight of the "pure" controlled substance. ***Commonwealth v. Corporan***, 531 Pa. 348, 352, 613 A.2d 530, 532 (1992) ("the mandatory sentencing provision can be triggered by the weight of a mixture in which cocaine has been combined with a cutting agent"); ***Commonwealth v. Lisboy***, 573 A.2d 222, 224 (Pa.Super. 1990), ***affirmed***, 531 Pa. 355, 613 A.2d 533 (1992) (rejecting appellant's claim that the weight of the pure cocaine in the mixture, rather than

the combined weight of the cocaine and the adulterants such as cutting agents in the mixture, should determine whether the mandatory sentencing provision is applicable).

In ***Lisboy***, the supreme court explained:

> In 18 Pa.C.S. § 7508(a)(3), supra, it is expressly stated that the mandatory minimum sentence shall apply "where the controlled substance is coca leaves or is any . . . preparation of coca leaves . . . or is any mixture containing any of these substances . . . ." (Emphasis added). The legislature could not have been more clear in expressing that, for purposes of the sentencing statute, a preparation or mixture containing cocaine is to be counted as a "substance." This reflects the legislature's awareness that cocaine is commonly possessed and circulated in a mixture containing cocaine and adulterants which serve as cutting agents. Within the same statutory provision, at subparagraph (3)(ii), supra, reference to the weight of the "substance" must be taken as referring to the same substance, namely the pure cocaine or any preparation or mixture thereof. To conclude otherwise would be to accord the term "substance" two different definitions within the same statutory provision, a result which would be both unreasonable and unsupported by any language in the statute. See 1 Pa.C.S. § 1922(1) (legislature cannot be presumed to intend an absurd or unreasonable result).

*Id*. at 351-352, 613 A.2d at 531. In other words, "[i]f the legislature had not intended to include preparations and mixtures containing cocaine as substances whose weights could trigger the mandatory sentencing provision, it would have made reference to the weight of the cocaine rather than the weight of the 'substance' as the triggering factor for imposition of a mandatory sentence." *Id*. at 352, 613 A.2d at 532. ***See Commonwealth v. Perez***, 580 A.2d 781 (Pa.Super. 1990), ***appeal denied***, 531 Pa. 652, 613 A.2d 558 (1992) (weight of the mixture containing cocaine, rather than weight of the pure cocaine contained therein, triggers application of mandatory sentencing under 18 Pa.C.S.A. § 7508(a)(3)).

The same rationale is applicable to an analysis of the statute's provisions regarding the drug methamphetamine. Put simply, the Commonwealth need not prove the exact weight of the pure methamphetamine which might have resulted from the final process of "cooking," the methamphetamine, nor the ratio of the other agents involved for the mandatory provisions of the Sentencing Code to apply.

In *Commonwealth v. Crowley*, 605 A.2d 1256 (Pa.Super. 1992), the court concluded that Section 7508 did not violate the due process clauses of the Pennsylvania and United States Constitutions. "Section 7508 was enacted to deal with an ever burgeoning area of criminal activity -- a drug epidemic, the effect of which pervades every aspect of our daily lives." *Crowley*, *supra* at 1260. Likewise, this court in *Commonwealth v. Eicher*, 605 A.2d 337 (Pa.Super. 1992), *appeal denied*, 533 Pa. 598, 617 A.2d 1272 (1992), explained that Section 7508 bore a rational relationship to valid state objectives in that it was designed to "alleviate the ravages of drug trafficking and drug abuse in our society by subjecting convicted drug dealers to greater periods of confinement." *Id*. at 352. The *Eicher* court, noting that "the legislature imposed more severe penalties on those individuals who were found to possess and/or deliver greater quantities of drugs," concluded "the legislature's scheme of imposing harsher penalties and longer periods of confinement on convicted drug dealers is rationally related to the laudable goal of attempting to put an end to the pernicious effects which drugs and the illicit drug trade have inflicted upon our society." *Id*. No relief is due.

(Resp't Ex. 18; ECF No. 9-6, pp.10-15).

There is no basis for this Court to disturb the Superior Court's adjudication of Petitioner's equal protection claim under AEDPA's limited standard of review. The Superior Court cited to and applied state cases which applied the appropriate equal protection review outlined in United States Supreme Court cases. *See*, *e.g.*, Reed v. Reed, 404 U.S. 71, 75-76 (1971) (collecting cases). Therefore, it was not "contrary to" United States Supreme Court precedent. Nor can it be found that the Superior Court's adjudication was "an unreasonable application of" that precedent. *See*, *e.g.*, Bell v. Cameron, 2011 WL 773275, at *9-10 (W.D. Pa. Feb. 28, 2011) (addressing similar equal protection argument with respect to 18 Pa. C.S.A. § 7508(a)(3)(ii)). Petitioner is therefore not entitled to habeas relief on this ground.

## 2. Ineffective Assistance of Counsel

Petitioner argues that his trial counsel was ineffective for failing to challenge the validity of the search of 132 Cherry Valley Road on the basis of "extreme force and threats made to [P]etitioner and Robyn Tuttle to gain consent" and that this prevented him from prevailing on

direct appeal. (ECF No. 1, p.7). While Petitioner did not make this exact challenge to his trial

counsel's representation in his PCRA, he did argue that his attorney was ineffective for failing to

properly challenge prior to trial the search of the residence at 132 Cherry Valley Road. *See* (ECF

No. 9-9, pp.3-4). In its Memorandum Opinion, the PCRA court addressed the claim as follows:

> At the time of the hearing on the Defendant's Petition under the Post
> Conviction Relief Act, Attorney Cingolani, trial counsel for the Defendant, was
> the first witness called upon to testify. He revealed the following. Attorney
> Cingolani was court appointed to represent the Defendant prior to trial. He
> requested and received discovery from the Commonwealth. Included within the
> discovery material provided was a consent to search form signed by Robyn Tuttle.
> In preparing for the case, Attorney Cingolani visited with and spoke to Ms. Tuttle
> at the "jail," presumably the Butler County Prison. Prior to filing an omnibus pre-
> trial motion, Attorney Cingolani consulted with the Defendant. The Defendant,
> Attorney Cingolani recalled, told him that he was handcuffed for "maybe" two
> hours on a hot day while the police searched his house after they obtained
> consent. Attorney Cingolani did not recall the Defendant reporting that he
> became sick during the time he was handcuffed. Attorney Cingolani did not
> recall being told that one of the police officers at the scene placed a boot on the
> Defendant's head. He testified that if he had been informed of that fact, he would
> have raised the issue. He did not recall doing so. He did recall that there was a
> five-year old boy present at the scene when the Defendant was handcuffed. He
> did not recall being informed that a police officer, after placing his foot on the
> Defendant's head, told the boy that "your daddy is not so tough now, is he?"
> 9/13/2013 N.T., p. 13. Attorney Cingolani recalled that the Defendant informed
> him that the police officers present informed him that Children and Youth would
> be called if consent to search was not given. Id. at 14.

> Attorney Cingolani recalled that the Defendant accompanied the police as
> they searched the residence. He testified that it was his belief that, while it may
> have been unusual for the police to permit a detainee to accompany them during a
> search, the police were doing so in order to allow the Defendant to implicate
> himself. Attorney Cingolani testified that he did not challenge the consent to
> search given by Robyn Tuttle in an omnibus pre-trial motion. Attorney Cingolani
> testified that he presumed the consent of Tuttle was valid. He also testified that:

> > Mr. Stackhouse had by that time told me that he had led the police officer
> > through the house and showed him stuff especially in the basement. So, I
> > thought I would get myself into a trap denying consent whenever he was
> > showing them around and consenting to them searching. So consent was
> > not a focus of this because of his actions. It put me in the position of

arguing there's no consent but I'm consenting, which is just absurd. So that's why I didn't do that.

Id. at 20-21. With respect to whether counsel attempted to elicit testimony concerning any "limitations put on the consent," Attorney Cingolani testified that, "[i]n the facts of this case, nothing would be suppressed . . . [b]ecause of the acts of [his] client." Id. at 21-22. Counsel testified that it was a deliberate choice on his part not to address the validity of Robyn Tuttle's consent to search either at trial or in his omnibus pre-trial motion. With respect to the omnibus motion, based on the information given to him by the Defendant concerning the events surrounding the search, Attorney Cingolani rejected the notion that Ms. Tuttle's consent was coerced. Id. at 27. Attorney Cingolani testified that, at the time he was preparing the omnibus motion, he did not think that challenging Ms. Tuttle's consent "would work nor did [he] know enough about it at that time nor could [he] have talked to her at the time. They would have all said this is not your client. So, no." Id. at 27. Attorney Cingolani went on to testify that he wrote the omnibus motion focusing on Mr. Stackhouse's non-consent. He testified: "for me to raise her nonconsent when she's not my client when I don't know what she would say or not say, I did not for lack of information or for lack of ability to investigate that. I did not raise it. No." Id. at 28.

With respect to the question of whether Attorney Cingolani challenged the validity of Ms. Tuttle's consent at trial, he testified that, "I chose not to because in my experience [the Defendant] could not use her consent or nonconsent and I could not raise it. She was the renter of the property. He was a guest there." Id. at 28. When asked about calling Ms. Tuttle as a witness, Attorney Cingolani testified:

No, they would block me. Your client is being asked to testify and they would say fifth amendment. I tried that one time, and they blocked me. I don't know how I ever got into see her in jail and she talked to me -- . . . . Because as I said every time I try and get some other criminal defendant up as a witness they said you're going to be testifying, anything you say can and will be used against yourself, and then the person is silenced. Should I have gone through the act of that? I don't know.

Id. at 28-29.

* * *

The Defendant next testified at the hearing. On May 10, 2011, the Defendant testified that he was residing at 132 Cherry Valley Road in Saxonburg, Pennsylvania. Id. at 50. When the police arrived, the Defendant testified, he was upstairs in the bedroom with Robyn Tuttle when her father informed him that there were two individuals in the back yard who wanted to speak to the Defendant

about a Ford Bronco that was for sale.  Id. at 51.  Ms. Tuttle was sent to speak to the individuals, the Defendant testified, and approximately ten minutes later Ms. Tuttle said "the police are here, and they want to talk to you, talk to them about a meth lab."  Id. at 51.  The Defendant then went to the back door and saw the police officers standing on the steps leading to the door.  Id. at 52.

The Defendant repeatedly told the police officers to get a warrant, he testified.  Id. at 53.  He testified that he was placed in handcuffs after he told the officers to "f**k off."  Id. at 54.  He described the encounter with the police as follows:

> They came in the house.  They came in the house, they pulled a taser.  I pulled back from the door.  I never actually came out of the house.  They came into the house, attacked me both of them.  Drug me outside.  I had one under each arm carrying me down the steps, across my yard.  I was thrown to the ground.  Put me in handcuffs.  And I was made to stay in that position for the remainder of the two hours until they signed a consent.

Id. at 54.  The Defendant testified that the five-year-old boy witnessed the above encounter, and additionally witnessed the police step on him.  Id. at 53.

The Defendant testified that he was placed face down on a downward grade and that he vomited approximately thirty minutes after he was placed on the ground.  Id. at 54.  The Defendant testified that he was permitted to sit up only after consent to search was granted by Ms. Tuttle.  Id. at 55.  Prior to giving consent, the Defendant testified, he was permitted to speak with Ms. Tuttle.  Id. at 55.  While initially unwilling to give consent, Ms. Tuttle agreed to permit the search, the Defendant testified.  The Defendant testified her decision was influenced by:

> What was told to me is that she come over to me crying and saying that they're going to take [the five-year-old child] if she doesn't sign the consent.  So, I told her if she signs the consent I want to be present to go in that house with them as they conduct their search because as she knows this because I pointed it out they planted evidence on my property to begin with, so.

Id. at 55-56.  The Defendant testified that at the time the consent to search was given, the police had been at the residence for a little more than two hours.  Id. at 57.  Once the consent was given, the Defendant testified, he was permitted to accompany Trooper Moriarty.  The Defendant testified that he led the trooper to a box that contained drug paraphernalia.  He then accompanied Trooper Moriarty through the house, downstairs, and then existed the residence.  After he was outside the residence for perhaps fifteen minutes, the Defendant testified, Trooper

Walker came out of the residence carrying two bags of Coleman fuel. Id. at 58. According to the Defendant, the above information was provided to Attorney Cingolani. Id. at 59. . . .

Robyn Tuttle was the final witness to testify at the hearing. On May 10, 2011, Ms. Tuttle was residing at 132 Cherry Valley Road. On that day Ms. Tuttle became aware that there were police officers present after the officers initially inquired into the price of a Ford Bronco that was for sale. Once outside of the residence, Ms. Tuttle testified, the officers identified themselves and presented their badges. Ms. Tuttle then went inside and informed the Defendant that there were police officers at the residence who were asking about the Defendant's warrants out of Florida. Id. at 70. Ms. Tuttle described what happened next:

> I witnessed that he came out, he came to the back door. Mr. Stackhouse came to the back door, and the officers said that they were there because of some Florida warrants, and they asked to search the premises. Mr. Stackhouse used the words, quote, f**k off and get a search warrant. At the time he proceeded back into the house. The officers came at him with a taser, right in front of my five-year old child and my fifty-eight year old father. So, they witnessed all of this. Once they took him down they forcefully took him out the back door, down the steps, and down on the ground. At that time he was handcuffed and left on the ground for approximately an hour to an hour and a half.

Id. at 71-72. Ms. Tuttle testified that during the takedown of the Defendant, one of the officers had his foot on the Defendant's head, looked at the child, and said "your daddy's not so big anymore, is he?" Id. at 73. Approximately thirty to forty-five minutes after the Defendant was placed on the ground, Ms. Tuttle testified, he vomited. The police, Ms. Tuttle testified, did not remove the Defendant from the vomit immediately, but they did after a time go to the Defendant and helped him sit up. During this time, Ms. Tuttle testified, her father became sick as well. Id. at 74. Ms. Tuttle also testified that "at least about three hours" passed between the time the Defendant first met with the police and the time at which the consent to search form was signed. Id. at 75.

Ms. Tuttle testified that the first time the police requested her consent to search, she refused. Id. at 75. The second time the police asked, Ms. Tuttle testified, she informed the police that she would have to discuss it with the Defendant before she gave them an answer. She then spoke to the Defendant about the officers conducting a search, and, she testified, "the condition that we came up with that we agreed on was that I would sign the consent but Mr. Stackhouse had to escort the officers into the home." Id. at 75-76. When questioned about why she changed her mind with respect to granting consent to search, Ms. Tuttle testified as follows: "I was being, I felt being badgered or coerced because the officers were telling me that don't worry, we won't call

14

Children and Families on you, and the second thing was that they also stated that they wouldn't arrest Stackhouse, which they both, they lied on both terms." Id. at 76. Ms. Tuttle testified that the Defendant was, in fact, permitted to accompany the officers during "most of" their search of the residence. Ms. Tuttle testified that once paraphernalia was found, the Defendant existed the residence. As the Defendant and Ms. Tuttle were sitting in the back of a vehicle, she testified, one or more officers entered the basement and one came out with two bags that contained meth oil. Id. at 77-78. Ms. Tuttle testified that she believed her consent was coerced and involuntary because the police pressured her and told her that they would not call "Children and Families" if she consented to the search. Id. at 78.

\* \* \*

Once more, for the sake of clarity, the Defendant is asserting that trial counsel rendered ineffective assistance by failing properly to raise and to litigate prior to trial the issue of the validity of the consent given by Robyn Tuttle and the scope of the search performed after the consent was given. To be quite direct, the testimony of the Defendant that was presented at the hearing on the Defendant's Petition, even if believed, adds little to our understanding of the circumstances surrounding the giving of the consent by Robyn Tuttle and the resulting search.

\* \* \*

There is no doubt that the interaction between the police and Ms. Tuttle was proper. During the entire encounter prior to the time when the consent to search form was signed, Ms. Tuttle was afforded significant freedom in her movements. Even viewed in a light favorable to the Defendant, the interaction amounted to an investigative detention that was supported by a reasonable suspicion that Ms. Tuttle was involved in the manufacturing of a controlled substance.

The question is then whether the consent was voluntarily given. Based on the facts adduced at the hearing on Ms. Tuttle's motion to suppress, in which she lodged a challenge to the validity of her consent and the scope of the subsequent search – the Court analyzed the search as follows:

> Trooper Brautigam and Trooper Moriarty knocked on the door of the residence and [Ms. Tuttle] answered. After stepping away from the doorway, the troopers spoke to [Ms. Tuttle] and asked whether other individuals were inside the residence. [Ms. Tuttle] indicated that Mr. Stackhouse was inside. At that point either [Ms. Tuttle] or Trooper Brautigam called to Mr. Stackhouse. Stackhouse stepped out and uttered a short impolite imperative sentence. He was thereafter put in handcuffs and placed on the grounds. [Ms. Tuttle] was not in any way restrained. Instead, she was permitted to converse with Mr. Stackhouse and was

permitted to enter the residence to get food. Once other troopers arrived, Trooper Moriarty asked [Ms. Tuttle] for consent to search the residence. Trooper Moriarty read to [Ms. Tuttle] a Pennsylvania State Police Waiver of Rights and Consent to Search form. Before consenting to the search, [Ms. Tuttle] was permitted to speak to Mr. Stackhouse. The pair decided to consent to a search of the residence on the condition that Mr. Stackhouse was permitted to accompany Trooper Moriarty during the search. That was the only limitation imposed with respect to the scope of the permitted search, and that condition was complied with by Trooper Moriarty. After reaching that decision, [Ms. Tuttle] signed the waiver form and consented to the search. The [Ms. Tuttle's] consent to search was voluntarily given.

11/2/2011 Memorandum Opinion at C.A. No. 960 of 2011, pp. 7-8. In the Court's view, the only testimony adduced at the hearing on the Defendant's Petition for Post-Conviction Collateral Relief that would remotely impact the material facts relied upon by the Court in making its determination of whether Ms. Tuttle's consent was voluntarily given is as follows: 1) that during the takedown of the Defendant, a police officer placed his foot on the Defendant's head, looked at the child present and said, "your daddy's not so big anymore, is he?"; 2) that Ms. Tuttle when first asked refused to provide consent to search; and 3) that the police told Ms. Tuttle that if consent to search was given, a child protective agency would not be called and the Defendant would not be arrested.

Looking to the totality of the circumstances, judged from the point of view of a reasonable person, the Court finds that Ms. Tuttle's consent to search was voluntarily given and was not the product of coercion. Ms. Tuttle was subjected to an investigative detention outside of her residence for a period of time between one and three hours. During that time she was permitted a significant amount of freedom. She was permitted to converse with the Defendant and was permitted to enter the residence. There was no testimony that the police had any physical contact with Ms. Tuttle, her son, or with her father. These factors weigh heavily in favor of finding that Ms. Tuttle's consent was voluntarily given.

While the Court understands that the circumstances surrounding the taking of a potentially armed and belligerent suspect to the ground, especially one who appears to be a user of methamphetamine, may be quite tense and not conducive to polite conversation, the statement by a police officer that "your daddy's not so big anymore, is he?", directed toward Ms. Tuttle's five-year-old child, weighs in favor of finding that consent was involuntary. Likewise, the fact that Ms. Tuttle first refused to give consent, and then consented after the police told her that "Children and Families" would not be called if consent was given, as well as the significant time lapse between the arrival of the police and the time the consent was given, weigh in favor of finding the consent was involuntary. Ms. Tuttle, however, as is noted above, was permitted during that time to confer with the

Defendant, as well as with her father and her son. Other than the bald assertion of Ms. Tuttle to the contrary, there was no testimonial evidence to support the notion that the police badgered her to give consent or that their requests were unduly repetitive. In fact, Ms. Tuttle consented to the search, according to her testimony, after a single previous refusal. Finally, and very importantly, in the Court's view, Ms. Tuttle was, at least by way of the Pennsylvania State Police Waiver of Rights and Consent to Search form, introduced into evidence at trial as Commonwealth's Exhibit 4, advised of her right to refuse to give consent to search. Looking at the totality of these factors, given the significant freedom of movement and interaction afforded to Ms. Tuttle, and the fact that she was informed of her right to refuse to consent, the Court finds that her consent to search the residence at 132 Cherry Valley Road was voluntarily given.

Regarding the question of whether the police officers exceeded the scope of the consent given, the Court has no hesitation in finding that they did not. Ms. Tuttle testified that: "the condition that we came up with that we agreed on was that I would sign the consent but Mr. Stackhouse had to escort the officers into the home." Id. at 75-76. The Defendant, Mr. Stackhouse, did in fact escort the officers into the home. There was no credible testimony that demonstrated any other conditions were placed on the consent to search.

As we have found that Ms. Tuttle's consent was voluntary and that the police officers did not exceed the scope of the consent given, the Court finds that the Defendant has failed to demonstrate that the assertions forming the bases of the Defendant's ineffectiveness claim were meritorious in the sense that even if they had been raised and litigated properly before trial, evidence resulting from the search of 132 Cherry Valley Road would not have been suppressed. Accordingly, the Court finds that the Defendant has not demonstrated, by a preponderance of the evidence, that his conviction resulted from the ineffective assistance of Attorney Cingolani.

(Resp't Ex. 23; ECF No. 9-9, pp.6-22).

On appeal, the Superior Court reviewed the testimony presented at Petitioner's PCRA hearing on September 19, 2013, and found that Attorney Cingolani "had a reasonable basis not to challenge Tuttle's consent." (Resp't Ex. 28; ECF No. 9-11, pp.4-5). Based on the fact that Petitioner accompanied the officers during their search of the premises, the Superior Court further found that there was "no arguable merit to [Petitioner's] claim that Attorney Cingolani's

failure to raise the issue [of the search exceeding the scope of consent given by Tuttle] in a motion to suppress constituted ineffective assistance of counsel."  Id. at pp.6-7.

Ineffective assistance of counsel claims are governed by the familiar two-prong test set forth in Strickland v. Washington, 466 U.S. 668 (1984), and, for AEDPA purposes, the Strickland test qualifies as "clearly established Federal law, as determined by the Supreme Court."  Williams v. Taylor, 529 U.S. 362, 391 (2000).  Under Strickland, a habeas petitioner must demonstrate that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's error, the result would have been different.  466 U.S. at 687.  For the deficient performance prong, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing processional normal."  Id. at 688.  To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.

As previously stated, the "clearly established Federal law" in which to analyze Petitioner's ineffective assistance claim is set forth in Strickland and the state courts applied this standard to Petitioner's claim.  Petitioner has not demonstrated that Strickland "requires the contrary outcome" with respect to his claim, and, therefore, the state courts' adjudication was not "contrary to" Strickland.  See also Werts v. Vaughn, 228 F.3d 178, 202-04 (3d Cir. 2000) ("[A] state court decision that applied the Pennsylvania [ineffective assistance of counsel] test did not apply a rule of law that contradicted Strickland and thus was not 'contrary to' established Supreme Court precedent.").

The dispositive question, then, is whether the state court's adjudication of Petitioner's claim was an "unreasonable application" of Strickland. It was not. In order to overcome AEDPA's standard of review, Petitioner must show that the state court's decision "cannot reasonably be justified under existing Supreme Court precedent[,]" Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 890 (3d Cir. 1999), and his general complaints about his attorney's representation fall far short of meeting this burden. Furthermore, based on both the PCRA and Superior Court finding that Petitioner's attorney had no basis to challenge Tuttle's consent, Petitioner cannot show prejudice in that an omnibus pre-trial motion requesting suppression of evidence on this basis would have been successful. As such, he is not entitled to habeas relief on this ground.

### 3. **Consideration of Evidence not of Record**

Petitioner's next ground for relief is based on the PCRA court's consideration of evidence and testimony of witnesses from the October 25, 2011 hearing on Robyn Tuttle's *nunc pro tunc* omnibus pre-trial motion. He claims that it was a violation of due process for the PCRA court to consider this evidence because he was not a participant in those proceedings and did not have the opportunity to confront or cross examine the witnesses whose testimony was later relied upon by the PCRA court in making its finding that the consent to search 132 Cherry Valley Road was voluntarily given by Tuttle.

On appeal from the denial of PCRA relief, Petitioner did not raise this issue in terms of a violation of due process, but he did argue that the PCRA court's reliance on the findings of fact issued by the Tuttle court constituted a violation of his Sixth Amendment rights because he was not a party to those proceedings and did not have the opportunity to cross-examine the troopers who testified at the hearing. The Superior Court addressed the issue as follows:

Had the PCRA court relied exclusively on the denial of Tuttle's pre-trial motion as a basis for finding a lack of arguable merit, we might have found some validity to Stackhouse's position. However, because the PCRA court had an independent basis on which to reach its conclusion that there was no arguable merit, we decline to grant relief on this issue.

(Resp't Ex. 28; ECF No. 9-11, p.6).

Before this Court, Petitioner's due process claim amounts to no more than a baldly asserted disagreement with the state court's resolution of his Sixth Amendment claim without any factual support. In fact, it was not even until he filed his Reply Brief that he pointed the Court to the exact "evidence" not of record to which he referred in his Petition. He also fails to argue why he believes he is entitled to habeas relief on this claim. Nevertheless, the Superior Court's adjudication of this claim was neither contrary to or an unreasonable application of clearly established Federal law, nor was it an unreasonable determination of the facts in light of the evidence presented. As that court specifically noted, the PCRA court did not rely exclusively on the Tuttle court's order when it reached its conclusion on Petitioner's claim of ineffective assistance of counsel and therefore no violation of Federal law occurred.

**4.  Fourth Amendment Violation**

In Petitioner's fourth ground for relief, he argues that the trial court's finding regarding Robyn Tuttle's consent to search was contrary to clearly established Fourth Amendment Federal law. Petitioner essentially claims that the trial court erred in finding no Fourth Amendment violation in connection with the search of 132 Cherry Valley Road when it concluded that the consent given by Tuttle was voluntary "in light of the overwhelming evidence to the contrary." (ECF No. 1, p.10).

Such a claim must be assessed by reference to the Supreme Court's decision in Stone v. Powell, 428 U.S. 465 (1976), which held as follows:  "[W]here the State has provided an

opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Id. at 494. Additionally, it is a petitioner's burden to show that the prohibition of Stone v. Powell is not applicable based on a claim that he was denied a full and fair opportunity to litigate the Fourth Amendment claim in the state courts. Sanna v. Dipaolo, 265 F.3d 1, 8 (1st Cir. 2001) ("The petitioner bears the burden of proving that his case fits within the contours of the [Stone v. Powell] exception", i.e., that the State did not afford him a full and fair opportunity to litigate the Fourth Amendment claim.) Finally, it is not necessary that a petitioner have actually litigated the Fourth Amendment claim in the state courts, it is well-settled that Stone bars federal habeas review when a petitioner *could* have litigated the claim as long as there was no unconscionable breakdown in that process that precluded the petitioner from utilizing it. *See* Caver v. Alabama, 577 F.2d 1188, 1192 (5th Cir. 1978); *see also* Boyd v. Mintz, 631 F.2d 247, 250 (3d Cir. 1980) (citing Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977)).

In this case, Petitioner was convicted after denial of a full and fair hearing on his challenge to the propriety of the search conducted by the troopers. After he filed an omnibus pre-trial motion seeking suppression of the evidence obtained as a result of the warrantless search, the court held a hearing, fully considered the claim and ultimately rejected Petitioner's contention finding that the search at issue was proper based on the consent of Robyn Tuttle. (Resp't Exs. 2&3; ECF No. 9-1, pp.3-14). Petitioner also raised on direct appeal a claim that the court erred in denying his motion to suppress based on the validity of Tuttle's consent to search being coerced by police conduct, but the claim was deemed waived because he had not advanced that particular challenge to the search in his omnibus pre-trial motion, only a challenge that the

warrantless search lacked probable cause. *See* (Resp't Ex. 19; ECF No. 9-6, pp.9-10). Nevertheless, the Superior Court found "no error in the trial court's finding that the search was properly conducted based on the Tuttle's consent." Id. at p.10. Hence, it appears that Petitioner did indeed have a full and fair opportunity to litigate this claim in the state courts, and, at the very least, he has not carried his burden to show otherwise. Hence, the doctrine of Stone v. Powell bars this claim.

Furthermore, even if the state courts got it wrong, which is not something this Court decides, such would not overcome the prohibition promulgated in Stone v. Powell that Fourth Amendment claims are not cognizable in federal habeas where the state has provided a full and fair opportunity to litigate the claim. *See*, *e.g.*, White v. Galaza, 2000 WL 630861, at *3 (N.D. Cal. May 8, 2000) ("If [petitioner] had the opportunity to litigate his Fourth Amendment claim, it cannot be the basis for granting his habeas petition, even if the state court's decision on his claim was contrary to clearly established Supreme Court precedent or involved an objectively unreasonable application of such precedent.") (citing Williams v. Taylor, 120 S. Ct. 1495, 1503 (2000) (wherein the Supreme Court noted it is "well settled that the fact that constitutional error occurred in the proceedings that led to a state-court conviction may not alone be sufficient reason" to grant a habeas petition, and citing Stone v. Powell, as an example of such an error)).

5.  **Illegal Sentence**

Petitioner's final ground for relief is that his sentence is illegal in light of Apprendi v. New Jersey, 530 U.S. 466 (2000), and Alleyne v. United States, 570 U.S. 99 (2013), because the facts that increased his sentence were not submitted to a jury and found beyond a reasonable doubt. In Apprendi, the United States Supreme Court ruled that the Sixth Amendment right to a jury trial prohibited judges from enhancing criminal sentences beyond the statutory maximum

based on facts other than those decided by the jury beyond a reasonable doubt.  In <u>Alleyne</u>, the Court ruled that, in line with <u>Apprendi</u>, all facts that increase a mandatory minimum sentence must be submitted to and found beyond a reasonable doubt by a jury.

First, it is noted that this claim was not presented to the state courts in any form and was raised for the first time in this habeas petition.  Thus, it is unexhausted.  *See* <u>O'Sullivan v. Boerckel</u>, 526 U.S. 842 (1999) ("Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court.  In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition.")  The claim is also procedurally defaulted since it can no longer be presented to the state court as all time periods to do so have expired.  *See* <u>Gray v. Netherland</u>, 518 U.S. 152, 162 (1996) (The procedural default doctrine prohibits federal habeas courts from reviewing a state court decision involving a federal question if the state court decision is based on a rule of state law that is independent of the federal question and adequate to support the judgment); *see also* <u>Rolan v. Coleman</u>, 680 F.3d 317 (3d Cir. 2012) ("Procedural default occurs when a claim has not been fairly presented to the state courts . . . and there is no additional state remedies available to pursue . . . or, when an issue is properly asserted in the state system but not addressed on the merits because of an independent and adequate state procedural rule . . . .").  Petitioner has not argued cause and prejudice to overcome this default, nor has he argued miscarriage of justice.  *See* <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991) ("In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.")  Nevertheless, the claim is without merit.

In this case, the Commonwealth sought the application of the mandatory minimum sentence of eight years imprisonment and a $50,000 fine as set forth by 18 Pa. C.S. § 7508(a)(4)(iii) because Petitioner was a subsequent offender and the weight of the mixture recovered was greater than 100 grams.  Additionally, the mandatory minimum sentence was doubled pursuant to 35 P.S. § 780-115(a) because Petitioner had a qualifying prior conviction. Petitioner was sentenced to 35 to 70 months of imprisonment for his conviction on count one for unlawful manufacturing of methamphetamine, and he was sentenced to a concurrent term of 96 to 240 months of imprisonment on count four for his conviction for manufacturing methamphetamine second or subsequent offense.

Petitioner argues that his sentence is illegal because the facts that led to "double the maximum sentence [that was] requested by the State" were not presented to the jury.  (ECF No. 14, p.16).  However, Petitioner mistakes the applicability of Apprendi and Alleyne because the Supreme Court has delineated an exception for facts that are prior convictions.  Specifically, in Almendarez-Torres v. United States, 523 U.S. 224 (1998), the Supreme Court stated that the fact of a prior conviction does not need to be submitted to a jury and found beyond a reasonable doubt and this was not overruled by the Court in Apprendi.  *See* Apprendi, 530 U.S. at 489.  In fact, the Alleyne Court explicitly noted that Almendarez-Torres remains good law.  *See* Alleyne, 570 U.S. at 111, n.1.  As such, even if Petitioner were to overcome the default of this claim, he would not be entitled to habeas relief.

**D.** **Certificate of Appealability**

A court should issue a certificate of appealability where a petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner meets this burden by showing that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). A certificate of appealability should be denied in this case because jurists of reason would not disagree with the Court's resolution of Petitioner's claims or conclude that they are "adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) (citing Slack, 529 U.S. at 484). A separate Order will issue.

Dated: March 30, 2019.

_____
Lisa Pupo Lenihan
United States Magistrate Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JUSTIN TIMOTHY STACKHOUSE, | ) | Civil Action No. 16 – 329 |
| Petitioner, | ) | |
| v. | ) | Magistrate Judge Lisa Pupo Lenihan |
| BRIAN V. COLEMAN, *Superintendent*, THE ATTORNEY GENERAL OF THE STATE OF PENNSYLVANIA, and BUTLER COUNTY DISTRICT ATTORNEY'S OFFICE, | ) | |
| Respondents. | ) | |

**AND NOW**, this 30th day of March, 2019;

**IT IS HEREBY ORDERED** that the Petition for Writ of Habeas Corpus (ECF No. 1) is denied.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is denied.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment in favor of Respondents and mark this case **CLOSED**.

**AND IT IS FURTHER ORDERED** that pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, Petitioner has thirty (30) days to file a notice of appeal as provided by Rule 3 of the Federal Rules of Appellate Procedure.

Lisa Pupo Lenihan
United States Magistrate Judge

Cc:    Justin Timothy Stackhouse
       KK-0431
       SCI Fayette
       P.O. Box 9999
       LaBelle, PA  15450-1050

       Counsel of record
       (Via CM/ECF electronic mail)